**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| INSOFTVISION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 10 C 3377 |
| v. | ) | |
| | ) | Judge George W. Lindberg |
| MB FINANCIAL BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are plaintiff Insoftvision, LLC's ("Insoftvision") motion for summary judgment against defendant MB Financial Bank, N.A. ("MB Financial"); Insoftvision's motion for judgment on the pleadings; Insoftvision's motion *in limine* to bar the expert testimony of Nicholas Weaver and Alan Slater; MB Financial's motion for summary judgment against Insoftvision; and third-party defendant ICS Technology Services' ("ICS") motions for summary judgment against MB Financial and Insoftvision. For the reasons stated below, Insoftvision's motion for summary judgment is denied, its motion for judgment on the pleadings is granted in part and denied in part, and its motion *in limine* is granted in part; MB Financial's motion for summary judgment against Insoftvision is denied; ICS's motion for summary judgment against MB Financial is denied, and its motion for summary judgment against Insoftvision is granted in part and denied in part.

**I.** *Factual Background*

Unless otherwise noted, the following facts are undisputed. Plaintiff Insoftvision was formed by third-party defendant Lanka Bharath Reddy ("Reddy"), along with non-party Peter Linney ("Linney"). Reddy also provided information technology services to Insoftvision.

Reddy's wife, third-party defendant Chandana Veerareddy ("Veerareddy"), had a 49% equity membership interest in Insoftvision, and claims to have been a co-manager of Insoftvision with Linney.

During the time period relevant to this case, nearly all of Insoftvision's revenue came from a single project for Insoftvision's customer, ABB, Inc. Insoftvision outsourced its work on the ABB project to third-party defendant ICS. Reddy worked on the ABB project, and oversaw the work ICS performed on the project. He also facilitated all of Insoftvision's business with ICS, including billing. Insoftvision contends that Reddy is also a principal of ICS, a contention that Reddy and ICS deny.

Angela Calabrese performed certain clerical and administrative duties for Insoftvision. Calabrese was an authorized signatory on Insoftvision's corporate checking account with defendant MB Financial, and her duties included ordering wire transfers from that account. Calabrese ordered the wire transfers by sending an e-mail from her "angie@everflora.com" e-mail account to her banker at MB Financial. Calabrese ordered at least 42 wire transfers from Insoftvision's account at MB Financial over the forty months prior to February 2009.

According to ICS, between September 2008 and November 2008 it issued three invoices to Insoftvision, totaling $1,110,190, for work done by ICS on the ABB project during that period. Insoftvision contends that it did not receive these invoices until early 2009, and that it received them from Reddy. It is undisputed that prior to February 23, 2009, Reddy asked Calabrese to initiate a $1,110,190 wire transfer to ICS.

On February 23, 2009 at 10:02 a.m., MB Financial received an e-mail from Calabrese's "angie@everflora.com" e-mail account that ordered a wire transfer of $1,110,190 of

Insoftvision's funds to ICS in India. MB Financial wired $1,110,190 to ICS, as directed in the e-mail. Calabrese denies sending the February 23, 2009 e-mail to MB Financial. Insoftvision contends that Reddy (who was not an authorized signatory on Insoftvision's account at MB Financial) hacked into Calabrese's e-mail account and sent the wire transfer request to MB Financial without Insoftvision's authorization. ICS denies any involvement in sending the wire transfer order, but maintains that Insoftvision owed it the $1,110,190 based on the three 2008 invoices.

A complicated series of court filings followed. Insoftvision initiated this action against MB Financial, seeking a refund of the transferred funds. MB Financial filed a third-party complaint against ICS, Reddy, and Veerareddy, seeking judgment against these parties in the event MB Financial is found liable to Insoftvision. ICS filed a claim against Insoftvision, seeking contribution in the amount of $1,110,190 for the 2008 invoices, in the event that Insoftvision prevails on its claims against MB Financial, and MB Financial prevails on its claims against ICS; ICS also alleges a breach of contract claim against Insoftvision for five additional invoices. Insoftvision filed a counterclaim against ICS, claiming unjust enrichment, conversion, fraud, and civil conspiracy. MB Financial filed a counterclaim against Insoftvision, seeking to collect on ICS's 2008 invoices under the law of restitution and/or subrogation in the event that Insoftvision prevails on its claim against MB Financial; the bank also seeks to collect on the invoices based on ICS's assignment of those claims to the bank. The parties have filed a number of motions relating to these claims, as described above.

**II.** *Analysis*

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The moving party bears the initial burden of demonstrating that no material issue exists for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the nonmoving party must offer specific facts demonstrating that a material dispute exists, and must present more than a scintilla of evidence to support its position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

    **A.**    *Insoftvision's Claim Against MB Financial*

The Court begins by examining Insoftvision's claim that MB Financial is liable to it for making an unauthorized wire transfer of Insoftvision's funds. Insoftvision has moved for summary judgment against MB Financial as to this claim. In addition, MB Financial has moved for summary judgment as to its seventh affirmative defense, through which the bank seeks to avoid liability on the basis that it used a commercially reasonable security procedure to verify the wire transfer order.

    The Federal Reserve regulations governing fund transfers through Fedwire[1] provide:

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is (i) not authorized and not effective as the order of the customer under [12 C.F.R. Pt. 210, Subpt. B, App. B,] section 4A-202, or (ii) not

---

[1] Fedwire is "the funds-transfer system owned and operated by the Federal Reserve Banks." 12 C.F.R. § 210.26(e). There is no dispute that the wire transfer at issue in this case was sent through Fedwire.

> enforceable, in whole or in part, against the customer under section 4A-203, the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount....

12 C.F.R. Pt. 210, Subpt. B, App. B § 4A-204(a). The regulations further provide that the receiving bank is not liable, even if the customer did not authorize the order, if the bank and customer agreed on a security procedure for verifying the authenticity of payment orders, the security procedure was "a commercially reasonable method of providing security against unauthorized payment orders," and the bank accepted the payment order "in good faith and in compliance with the security procedure." *Id*. § 4A-202(b).

In support of its motion for summary judgment on this claim, Insoftvision first argues that there is no dispute that the February 23, 2009 wire transfer order was unauthorized. Calabrese denies having sent the wire transfer request to MB Financial, and she and the two other authorized signatories on Insoftvision's account deny having authorized the wire transfer. In addition, Insoftvision contends that a rule was set up on Calabrese's computer, by someone other than Calabrese, that automatically diverted e-mails from MB Financial into a folder; Insoftvision argues that this is evidence that a hacker was trying to prevent Calabrese from seeing MB Financial's e-mail confirming the wire transfer. Finally, Insoftvision notes that it reported the matter to the FBI, the Secret Service, the Franklin Park Police, and the Illinois Attorney General, which it argues is an action consistent with a response to learning of an unauthorized transfer.

MB Financial responds that a factual dispute exists as to whether Insoftvision authorized the wire transfer, and takes the position that Calabrese sent the e-mail requesting the transfer. As an initial matter, the Court notes that MB Financial did not file a statement of additional facts,

but rather attempted to present its additional facts in its response brief. Local Rule 56.1(b)(3)(C) requires that a party opposing a motion for summary judgment file "a statement, consisting of short numbered paragraphs, of any additional facts that required the denial of summary judgment." This rule "provides the only acceptable means of . . . presenting additional facts to the district court." *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995). Providing additional facts in a response brief is "insufficient to put those facts before the Court." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Accordingly, the Court disregards MB Financial's additional facts presented in its response brief.

Even without considering MB Financial's additional facts, however, the Court agrees with the bank that a question of fact exists as to whether Insoftvision authorized the wire transfer. It is undisputed that the wire transfer request was made from Calabrese's e-mail address, that she is an authorized signatory on Insoftvision's account with MB Financial, that she had previously ordered similar wire transfers by e-mail, and that prior to February 23, 2009 Reddy asked her to transfer $1,110,190 to ICS. Although Insoftvision urges the Court to give Calabrese's testimony "significant weight," this is not the time to assess credibility or weigh testimony. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."). The Court concludes that a genuine issue of material fact exists as to whether Insoftvision authorized the February 23, 2009 wire transfer. Insoftvision's motion for summary judgment as to its claims against MB Financial is denied.

The Court turns to MB Financial's motion for summary judgment based on its seventh affirmative defense. In that defense, MB Financial contends that even if the wire transfer order was unauthorized, it is not liable to Insoftvision because the bank used a commercially reasonable security procedure to verify the order. A security procedure is a procedure established by agreement between a customer and the bank receiving a payment order, for the purpose of verifying that the payment order is that of the customer, or detecting an error in the transmission or content of the payment order. 12 C.F.R. Pt. 210, Subpt. B, App. B § 4A-201. A security procedure "may require the use of algorithms or other codes, identifying words or numbers, encryption, callback procedures, or similar security devices." *Id*.

Factors relevant to whether a security procedure is commercially reasonable include: (1) the wishes the customer expressed to the bank; (2) the customer's circumstances that are known to the bank, including the size, type, and frequency of payment orders normally issued by the customer to the bank; (3) alternative security procedures offered to the customer; and (4) security procedures in general use by similarly situated banks and customers. 12 C.F.R. Pt. 210, Subpt. B, App. B § 4A-202(c). A security procedure is deemed to be commercially reasonable if it:

> (i) . . . was chosen by the customer after the bank offered, and the customer refused, a security procedure that was commercially reasonable for that customer, and (ii) the customer expressly agreed in writing to be bound by any payment order, whether or not authorized, issued in its name and accepted by the bank in compliance with the security procedure chosen by the customer.

*Id*. Whether a security procedure is commercially reasonable is a question of law. *Id*.

MB Financial first argues that the procedure used on February 23, 2009 should be deemed commercially reasonable because the bank offered Insoftvision a commercially reasonable security procedure, which Insoftvision refused. MB Financial offers evidence that

7

when Insoftvision opened its account with MB Financial, MB Financial sent Insoftvision a "Corporate Checking Account Information" form that asked, among other things, whether Insoftvision needed "[o]ther services . . . (such as ability to originate ACH, Wire Transfers, Check Images via CD, Lockbox, etc.)" On behalf of Insoftvision, Calabrese responded "Not yet" to this question. MB Financial argues that the question on the form as to whether Insoftvision needed other services, including the ability to send wire transfers, constituted an offer of MB Financial's standard on-line banking option for wire transfers, "Corporate Interconnect." MB Financial contends that Calabrese was familiar with Corporate Interconnect because she had used it since 2002 to send wire transfers on behalf of a company related to Insoftvision, and that her "Not yet" statement on the Corporate Checking Account Information form constituted a refusal of Corporate Interconnect's security procedure.

MB Financial's argument is unpersuasive. The Corporate Checking Account Information form merely asks customers to identify what other services they need, and did not mention any security procedure for wire transfers, let alone offer Corporate Interconnect as a security procedure. Nor would Calabrese be expected to read such an offer into the form based on her prior experience using Corporate Interconnect. The Court concludes that MB Financial has not shown that it offered Insoftvision any security procedure, or that Insoftvision rejected the bank's security procedure.

MB Financial also argues that the procedure that was used relating to the February 23, 2009 wire transfer – receiving an e-mail from an authorized signatory's e-mail account -- was commercially reasonable in its own right. MB Financial rests this argument on the conclusions of its experts, Nicholas Weaver and Alan Slater, that this procedure was commercially

reasonable. Insoftvision has moved to exclude Weaver and Slater's expert evidence from consideration in support of MB Financial's motion for summary judgment, and to bar these witnesses from presenting expert testimony at trial. Insoftvision argues that the issue of whether the procedure that MB Financial used relating to the February 23, 2009 payment order was commercially reasonable is a question of law, and as such is not a proper subject of expert testimony.

The Court need not address Insoftvision's arguments relating to the use of Weaver and Slater's expert opinions in these summary judgment proceedings because MB Financial has not properly offered these opinions. In support of its argument that the e-mail procedure was commercially reasonable, MB Financial cites paragraph 44 of its Statement of Material Facts, which in turn cites only Slater's expert report and MB Financial's attorney's expert disclosures describing Weaver's anticipated testimony. In order to establish a fact in support of summary judgment, however, a party must present competent evidence of a kind that would be admissible at trial. *See Bombard v. Fort Wayne Newspapers*, 92 F.3d 560, 562 (7th Cir. 1996). An unsworn expert report unaccompanied by an affidavit that verifies its authenticity does not suffice. *See Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003). Nor does a party's expectation of how an expert would testify at trial. *See Boruski v. U.S.*, 803 F.2d 1421, 1428 (7th Cir. 1986). Since MB Financial has not offered admissible evidence of Weaver and Slater's opinions, they are not part of the record before the Court on summary judgment.

Even if MB Financial had properly offered Weaver and Slater's opinions, however, the Court agrees that the legal question of whether the procedure used by MB Financial was commercially reasonable is not a proper subject for expert testimony. Expert testimony is not

9

admissible unless it would be relevant, and would assist the trier of fact in understanding the evidence or determining a fact in issue. *See* Fed. R. Evid. 702; *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). "[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). MB Financial concedes that the question of the commercial reasonableness of its security procedures is "ultimately a question for the Court rather than the jury to decide," but argues that expert testimony on banking practices, procedures, and standards would be permissible expert evidence.

Insoftvision's motion *in limine* is granted in part: MB Financial is barred from presenting expert testimony at trial on the legal question of whether its security procedure was commercially reasonable. This ruling does not preclude MB Financial from offering expert opinions regarding banking practices, procedures, and standards.

The Court next examines whether MB Financial has otherwise established that it used a commercially reasonable security procedure. It is undisputed that MB Financial used none of the types of security procedures listed in 12 C.F.R. Pt. 210, Subpt. B, App. B § 4A-201 (such as a code or callback procedure) to verify the authenticity of the February 23, 2009 wire transfer order. Nor do the factors listed in § 4A-202(c) support a finding that MB Financial's procedure of accepting an e-mail from Calabrese's account amounted to a commercially reasonable security procedure. First, there is no evidence in the record that Insoftvision expressed any wishes to the bank on the issue of security procedures. In addition, Insoftvision's wire transfers were for sizable amounts of money, a circumstance that would weigh in favor of using a more stringent security procedure. As discussed above, there is no evidence in the record that MB

...

Financial offered Insoftvision any alternative security procedures. Finally, there is no evidence as to whether similarly situated banks and customers use a procedure limited to receiving an e-mail payment order from a customer.[2]

As MB Financial notes, a user name and password were required to access Calabrese's "angie@everflora.com" e-mail account. However, MB Financial does not cite any authority supporting its argument that its reliance on the security procedures in place for *Insoftvision's* e-mail system, over which MB Financial had no control, could satisfy the requirement that the bank use security procedures to verify that payment orders are authentic. At best, the bank's receipt of a wire transfer order from Calabrese's "angie@everflora.com" e-mail account was akin to comparing a signature on a written order, which by itself does not amount to a security procedure. *See* 12 C.F.R. Pt. 210, Subpt. B, App. B § 4A-201 ("[c]omparison of a signature on a payment order or communication with an authorized specimen signature of the customer is not by itself a security procedure.").

The Court concludes that, as a matter of law, MB Financial's procedure of receiving an e-mailed payment request from Calabrese's "angie@everflora.com" account was not a commercially reasonable security procedure. MB Financial's motion for summary judgment as to its seventh affirmative defense is denied.

---

[2] Evidence submitted in connection with Insoftvision's motion for summary judgment includes MB Financial's wire transfer expert's testimony that he was unaware of any other bank that accepted a wire transfer request in 2009 based on a single e-mail.

### B. *MB Financial's Counterclaim Against Insoftvision*

#### 1. *Count I*

In Count I of its counterclaim against Insoftvision, MB Financial claims that if it is liable to Insoftvision, MB Financial is entitled to collect on ICS's claims on the 2008 invoices under the law of restitution and subrogation. Given the Court's denial of Insoftvision's motion for summary judgment as to its claims against MB Financial, Count I of MB Financial's contingent motion for summary judgment as to its counterclaim against Insoftvision is also denied.[3]

#### 2. *Count II: ICS's Assignment of Its Invoice Claims to MB Financial*

On December 28, 2010, after this case was filed, ICS executed an "Assignment of Joint Interest in Claims," in which it assigned to MB Financial "a joint, undivided interest" in ICS's claims against Insoftvision relating to the three 2008 invoices. The Assignment stated:

> It is intended that this Assignment of Joint Interest in Claims makes ICS and MB Financial joint owners of all claims or causes of action within its scope with the complete, unconditional and equal rights to pursue, collect upon, enforce, compromise, settle and/or release the claims, jointly or separately.

After ICS executed this Assignment, MB Financial amended its counterclaim against Insoftvision to assert in Count II that if Insoftvision prevails on its claims against the bank, and the bank prevails on its claims against ICS, the bank would be entitled to collect on ICS's invoice claims based on the Assignment. ICS had previously filed a claim against Insoftvision based on the same invoices, which remains pending.

---

[3] The Court notes that it has not expressed any opinion on the merits of MB Financial's arguments regarding the application of the discharge for value rule, contrary to the bank's suggestion in its response to Insoftvision's motion for summary judgment.

Insoftvision moves for judgment on the pleadings as to Count II of MB Financial's first amended counterclaim against Insoftvision or, in the alternative, as to Count II of ICS's claim against Insoftvision. Insoftvision argues that ICS's assignment of a joint, undivided interest to MB Financial was invalid because ICS did not give up its rights in the process. Essentially, Insoftvision is arguing that either ICS or MB Financial can pursue the claim, but that they cannot both do so.

An assignment is "a transfer of some identifiable interest from the assignor to the assignee." *Cincinnati Ins. Co. v. Am. Hardware Mfrs. Ass'n*, 898 N.E.2d 216, 229-30 (Ill. App. Ct. 2008), *appeal denied*, 904 N.E.2d 978 (Ill. 2009). An assignment "transfer[s] to the assignee all the right, title or interest of the assignor in the thing assigned." *Id.* at 230. "Thus, the assignee stands in the 'shoes' of the assignor." *Brandon Apparel Group v. Kirkland & Ellis*, 887 N.E.2d 748, 756 (Ill. App. Ct. 2008). Following a valid assignment, "[t]he assignor no longer has any rights in the property assigned." *People v. Wurster*, 422 N.E.2d 650, 652 (Ill. App. Ct. 1981).

MB Financial and ICS contend that the Assignment was valid as a partial assignment. It is true that an assignment of a part of an action may be valid. *See Cincinnati Ins. Co.*, 898 N.E.2d at 230 (stating that in order to be valid, an assignment "needs only to assign or transfer the whole or a part of some particular thing, debt, or chose in action."). Thus, for example, ICS could have assigned to the bank the portion of its claim relating to the September 30, 2008 invoice, and retained the portion of its claim relating to the other two invoices. ICS was not attempting to transfer any part of its interest in the claim from itself to MB Financial, however, but rather was attempting to share its claim with MB Financial. Because ICS did not give up any

13

part of its interest, this was not a valid assignment, partial or otherwise. Insoftvision's motion for judgment on the pleadings is granted as to Count II of MB Financial's first amended counterclaim against Insoftvision; the alternative motion as to Count II of ICS's claim is denied. MB Financial's motion for summary judgment as to Count II of its counterclaim is denied as moot.

### C. *ICS's Motion to Join MB Financial's Motion for Summary Judgment Against Insoftvision, and Motion for Summary Judgment Against MB Financial*

ICS's motion to join MB Financial's motion for summary judgment against Insoftvision is denied, since MB Financial's motion did not relate to claims brought by or against ICS. ICS's motion for summary judgment against MB Financial, which in turn is contingent on the grant of MB Financial's motion for summary judgment against Insoftvision, is also denied.

### D. *Insoftvision's Claims Against ICS*

The Court next turns to ICS's motion for summary judgment as to Insoftvision's claims against ICS. Insoftvision asserts claims of unjust enrichment, conversion, fraud, and civil conspiracy against ICS, in an effort to recoup the $1,110,190 that Insoftvision alleges was improperly transferred to ICS. Insoftvision also asserts claims of unjust enrichment and conversion against ICS based on allegations that ICS unjustly retained a greater share of the revenue from the ABB project than the share to which it was entitled.

#### 1. *Unjust Enrichment and Conversion*

ICS argues that it is entitled to summary judgment as to Insoftvision's unjust enrichment and conversion claims in Counts I through IV of Insoftvision's counterclaim because ICS was entitled to the funds at issue. In order to prevail on an unjust enrichment claim or a conversion claim under Illinois law, a plaintiff must establish that the defendant was not entitled to the

14

property at issue. *See HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989) (to prevail on an unjust enrichment claim, a plaintiff must show that the defendant "unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."); *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005) (citing *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998)) (to prevail on a conversion claim, a plaintiff must show that the defendant "wrongfully and without authorization assumed control, dominion, or ownership over the property").

### a. ICS's Entitlement to the $1,110,190

ICS first argues that Insoftvision cannot establish that ICS unjustly retained the $1,110,190 transferred to it by MB Financial. It is undisputed that on January 29, 2009 or January 30, 2009, ABB paid Insoftvision $1,139,840 for work ICS performed on the ABB project. ICS offers three invoices it claims it issued to Insoftvision between September 30, 2008 and November 28, 2008, totaling $1,110,190, for work ICS did on the ABB project. In addition, ICS offers affidavits of Reddy and Veerareddy (who claims to have been Insoftvision's co-manager), stating that the amounts reflected in the invoices were due and owing to ICS as of February 23, 2009, for work ICS did on the ABB project. ICS argues that this evidence establishes that it was entitled to the $1,110,190 when that amount was transferred to ICS on February 23, 2009.

Insoftvision characterizes these invoices as "bogus," and contends that Reddy created them to justify his request for the transfer of the $1,110,190. According to Insoftvision, it did not receive the invoices until Reddy transmitted them to Insoftvision in early 2009, after

15

Insoftvision had rejected Reddy's request to transfer the funds. Insoftvision states that Reddy had previously created invoices at year-end for tax purposes after the transfers had occurred, and argues that the three invoices at issue here were not created in the ordinary course of business. Insoftvision's evidentiary support for its theory that Reddy created ICS invoices after the fact is lacking, however; Insoftvision cites only Peter Linney's testimony on this point: "I don't have any evidence, but my understanding, Mr. Reddy was producing those invoices after the fact." Insoftvision also observes that no forensic evidence of when the invoices were created or transmitted to Insoftvision exists, because ICS destroyed the computers on which the invoices were created, and that ICS does not have electronic copies of the invoices.

In addition, Insoftvision disputes Veerareddy's claim that she was a co-manager of Insoftvision. In support of that claim, Veerareddy attached to her affidavit Insoftvision's LLC registration form filed with the Illinois Secretary of State, which lists Veerareddy as a manager of the company, along with Linney. Insoftvision disputes that Veerareddy acted as a manager, based on Linney's testimony that Veerareddy did no work for Insoftvision.

Insoftvision also attempts to challenge the invoices based on the rates charged in them. ICS charged Insoftvision higher rates than it charged other customers, which Insoftvision suggests "raise[s] further questions about the authenticity of the invoices and the alleged $1.1 million debt." However, it is undisputed that Insoftvision's previous payments to ICS were at the same higher rate.

According to Insoftvision, it owed ICS nothing as of February 23, 2009 because it had already paid ICS for all of ICS's expenses prior to that date. ICS does not dispute that prior to February 23, 2009, Insoftvision had sent more than $8 million to ICS. However, in support of its

contention that this $8 million covered all of ICS's expenses and that Insoftvision owed ICS nothing further, Insoftvision cites only to Linney's inapposite deposition testimony:

> As I went through the end of December with Mr. Reddy's – a conversation with him saying that all the money is his followed up by two invoices I received in January was the first time I saw invoices from ICS Technologies to Insoftvision, followed by the accounting meeting, the book of invoices, the balance amounts, you know, that was discussed with the accountants of where we were financially, the amount of money that was going to be left in the bank account should these three invoices be paid, the numbers just did not add up, you know, there was definitely – I felt very uncomfortable and definitely knew they were not valid. These – to me, looks like Mr. Reddy was trying to pull a fast one on me and get money out of the company.

Although Calabrese maintained a spreadsheet that reflected Insoftvision's daily cash balance, Insoftvision kept no other type of bookkeeping records, such as accounts payable or accounts receivable records.

As the Seventh Circuit has repeatedly warned, summary judgment is the "put up or shut up" moment in a lawsuit, that is, the time for the party responding to a motion for summary judgment to come forward with the evidence it has. *See*, *e.g.*, *Eberts v. Goderstad*, 569 F.3d 757, 767 (7th Cir. 2009). In order to survive summary judgment, Insoftvision must offer evidence on which a jury could reasonably find in its favor, and a "mere existence of a scintilla of evidence" in support of its position is insufficient. *See Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). While Insoftvision has raised questions as to the authenticity of the invoices, the Court cannot say that no reasonable jury would credit them. Insoftvision offers no evidence that ICS did not do the work it claims to have done on the ABB project, or that Insoftvision paid ICS for all of its work prior to February 23, 2009. Insoftvision bears the burden of proof on its claims, and has failed to meet it by offering any evidence that ICS was not entitled to the $1,110,190. ICS's motion for summary judgment as to Counts I and III of Insoftvision's

17

counterclaim is granted.

### b. Revenue sharing

ICS also argues that it is entitled to summary judgment as to Insoftvision's claims that ICS improperly retained a greater share of the revenue from the ABB project than the share to which it was entitled. ICS argues that there is no dispute that it earned the money it was paid for its work on the ABB project, and that there was no agreement between ICS and Insoftvision to share revenue.

Peter Linney testified that he entered into an agreement with Reddy that provided that they would share in the revenues generated by Insoftvision's clients, although Linney conceded that at the beginning there was no agreement as to what the split would be. Insoftvision contends that Linney entered into that agreement on Insoftvision's behalf, and that Reddy entered into the agreement on behalf of ICS. Insoftvision also contends that it made a demand on Reddy for the return of the funds.

In support of its contention that Reddy was affiliated with ICS, Insoftvision offers evidence that Reddy co-founded ICS and that in 2005 Reddy signed an agreement as "Principal" of ICS. Reddy and ICS deny that Reddy was affiliated with ICS in any way. The Court finds that a factual dispute exists as to Insoftvision's claims relating to revenue sharing. ICS's motion for summary judgment as to Counts II and IV of Insoftvision's counterclaim against ICS is denied.

### 2. *Fraud and Civil Conspiracy*

ICS argues that it is entitled to summary judgment on Insoftvision's fraud and civil conspiracy claims because there is no evidence that ICS made any misrepresentation to

18

Insoftvision, or conspired to defraud Insoftvision. Insoftvision's fraud and conspiracy claims are based on Insoftvision's allegation that Reddy manipulated Insoftvision's e-mail system in order to send the wire transfer order without authorization. ICS argues that Reddy's actions cannot be imputed to ICS because Reddy is not affiliated with ICS.

Even if Insoftvision were able to establish that Reddy was acting on behalf of ICS, Insoftvision has not offered any admissible evidence to support its contention that Reddy hacked into Insoftvision's e-mail system and sent the payment order to MB Financial. Insoftvision cites its own interrogatory responses, signed only by its attorney, which reference Reddy's cell phone records, state that Reddy had access to passwords and Insoftvision's office space, and which make numerous statements "[o]n information and belief," such as that "someone" accessed plaintiff's server and installed spam guards. "Sworn interrogatory answers may be considered in conjunction with a summary judgment motion only if the person answering the interrogatory had personal knowledge or was competent to testify as to the matters stated." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1166 (7th Cir. 1996). Moreover, statements made "upon information and belief," even in an affidavit, do not satisfy the personal knowledge requirement for opposing summary judgment. *See Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991). Statements made by Insoftvision's attorney without personal knowledge do not come close to satisfying these requirements.

Since Insoftvision cannot establish that ICS made any misrepresentation to Insoftvision, ICS's motion for summary judgment as to Insoftvision's fraud and civil conspiracy claims in Counts V and VI of Insoftvision's counterclaim is granted.

**ORDERED:** Plaintiff Insoftvision's motion for judgment on the pleadings [94] is granted in part and denied in part: the motion is granted as to Count II of MB Financial's first amended counterclaim against Insoftvision, and denied as to Count II of ICS's claim against Insoftvision. Defendant MB Financial's motion for summary judgment [157] is denied. Plaintiff Insoftvision's motion for summary judgment [163] is denied. Plaintiff Insoftvision's motion *in limine* to bar the expert testimony of Nicholas Weaver and Alan Slater [166] is granted in part. ICS's motion to join in MB Financial's motion for summary judgment against Insoftvision, and ICS's motion for summary judgment against MB Financial [168] are denied. ICS's motion for summary judgment against Insoftvision [170] is granted in part and denied in part: the motion is granted as to Counts I, III, V and VI of Insoftvision's counterclaim against ICS, and denied as to Counts II and IV. No court appearance is required on September 21, 2011.

ENTER:

George W. Lindberg
Senior United States District Judge

DATED: September 12, 2011